JENKINS, Circuit Judge,
upon this statement of the case, delivered the opinion of the court.
The law which governs this case is well settled. A tug is neither a common carrier nor an insurer, nor is the highest possible degree of skill and care exacted of her. She is bound to exercise reasonable care and skill in the performance of the duty assumed, and failure therein is a gross fault, creating liability for injury. The Margaret, 94 U. S. 494; The L. P. Dayton, 120 U. S. 337, 7 Sup. Ct. 568. The difficulty arises, not in the law, but in the ascertainment of the facts from the evidence, which, in cases like the present, is usually conflicting. This one furnishes no exception to the rule. There is here no presumption of negligence arising from the *155 fact of the disaster, and the burden of proof is put upon the libel-•ant to satisfy the court upon the evidence presented and upon the reasonable probabilities of the case that the tug was guilty of the fault charged through failure to exercise ordinary skill and care.
There would seem to be no need to enter into a discussion of the voluminous evidence presented to the court. It would do no possible good, and would but incumber the reports. The considerations which have led to our conclusion may be briefly stated. The purpose of the tug was unquestionably to take her tow northward up the Milwaukee river. The contention of the tug is that she made the proper maneuver for that purpose at the proper time, and when about opposite the life-saving station. The charge in the libel is that the maneuver was not attempted until the schooner was within 150 feet of Benjamin’s dock, when the tug, without signal, suddenly shot across the bow of the schooner, going at full speed, and fetched' up on the towline with a tremendous jerk, which parted it. This is the only wrongful act asserted. If this charge be true, it'exhibits not only a want of ordinary skill, but a willful and recldess act, and, as it seems to us, without possible motive to sanction it, or reason to suggest it. If, for any uncontrollable cause, the schooner had got within 150 feet of the Benjamin dock, and was in danger of colliding therewith, and the tug had suddenly shot across the bows of her tow, straining on the line, to swing her from her course to avoid collision, the alleged maneuver might be comprehended as a desperate act in extremis; but that skilled seamen, as were those on board of the tug, desiring to go up Milwaukee river, which was there 550 feet in width, should not change course from west to north before arriving within 150 feet of the west bank of the river, and this in manifest disregard of the most ordinary rules of seamanship, and without cause for or purpose in the delay, passes comprehension. Such action is only 'explainable or made credible upon the theory of utter incompetency in seamanship. The burden of proof being upon the libel-ant asserting this charge, it must be made out satisfactorily, and this has not been done. It is proven, as we think, by the preponderance of evidence, and is coincident with what was naturally to be expected under the circumstances, that the tug changed her course to the north, upon proper signal to the schooner, when about opposite to or easterly of the life-saving station; and that the schooner answered to the signal that her helm had been put hard a-port, but that for some reason she did not follow the course of the tug, but kept on a westerly course until the towline parted, and she collided with the dock; and this notwithstanding the efforts of the tug to turn her bow. This failure upon the part of the schooner may have resulted from the length of line which she had been unable for some reason to haul in, and the inability of the tug by reason thereof to properly control her movements. It may have resulted from the strong swell carrying her forward. It may *156 have resulted from failure of the schooner to respond to her helm. It may have resulted from a combination of these causes. No fault in respect to any of these possible causes is charged against the tug. It may have been for the reason, asserted by the witnesses for the libelant, that the helm of the schooner was not in fact put hard a-port until within 150 feet of the dock. The latter cause would clearly account for the disaster, and may have proceeded from failure to notice or from disregard of the signal by the master or wheelsman of the schooner. This cause, while it explains the disaster, would acquit the tug of fault if the signal was timely given, as is established by the preponderance of the evidence. Whatever the cause, it is not satisfactorily shown to be owing to the fault of the tug. It was of course the duty of the tug, when it became evident that the schooner did not answer to her helm, to make diligent effort to prevent collision. This she attempted to do, and in the doing of it the hawser parted, not by excessive strain upon it, or from chafing, but by cutting by coming in contact with the bobstay plates of the schooner, under the water, as is evidenced by the appearance of the line which was inspected by the court. We are not satisfied, upon a careful consideration of all the evidence in this cage, that there was want of ordinary skill and care upon the part of the tug. While strenuous to hold those engaged in the towing of vessels to a strict performance of duty, we cannot place upon them a greater burden than the law imposes, or assume without satisfactory proof, or from the mere fact of injury, that they have been derelict in duty. The decree appealed from will be affirmed.